## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAMES W. GREEN, and AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA, | |
| Plaintiffs, | |
| v. | Case No. 05-CIV-406-RAW |
| BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF HASKELL, and HENRY FEW, | |
| Defendants. | |

## OPINION AND ORDER

The present kerfuffle ensued when Plaintiff James W. Green took offense at the erection of a Ten Commandments Monument on the lawn of the Haskell County courthouse. Along with the American Civil Liberties Union of Oklahoma ("ACLU-Oklahoma"), Green commenced these proceedings seeking, among other things, removal of the Monument. Trial of the issues was held on May 1-2, 2006.

### CANTICA I.  FINDINGS OF FACT

**Canto A.**    **Here Is Set Forth The Story Of The Monument's Erection And The Subsequent Although Not Necessarily Consequent Events.**

Located in Southeastern Oklahoma, Haskell County has a population of about 15,000 people. The seat of county government is in Stigler, which is home to approximately 2,500 souls. Everyone knows each other.

Highway 9 is one of the major state highways in Haskell County. It becomes Main Street as it runs through Stigler and passes directly in front of the Haskell County courthouse. It is the busiest street in Stigler.

The courthouse sits in the middle of approximately one square block of county property. Parking lots exist on both sides and in back of the courthouse. No parking exists at the front of the property except a few parallel parking spaces on Highway 9 itself. Most people who come to the courthouse to conduct business park in the side or rear parking lots.

The setting of the courthouse grounds is somewhat bucolic. Squirrels run across the grass, tall trees shade the lawn and neat sidewalks criss-cross it to converge at the front and side entrances. A small, rustic log cabin housing the Haskell County Historical Society is on the northeast side of the property. A picturesque gazebo, suitable for anything from political rallies to orchestral performances, stands on the northwest corner. Indeed, a number of public and private events take place on the courthouse lawn and at the gazebo.

The courthouse itself is not, from all appearances, an architectural marvel. To the court's untrained eye, its style could be described as "muscular brick and concrete with turquoise trim." A cheerful looking building it is not; however, no question has been raised regarding its functionality.

Spread willy-nilly over the front lawn of the courthouse is a mélange of marble[1] monuments of various styles, sentiments and construction. Private citizens paid for and erected most of the monuments. The largest monument sits smack dab in the center of the lawn. It lists and honors Haskell County citizens who died in World Wars I and II. In front of it are smaller monuments for

---

[1] Admittedly, the court is ignorant geologically and has no clear knowledge of whether the hard impermeable substances constituting the monuments are marble, granite, limestone or something else. They look marble; therefore, that is what the court will call them. Also, like "mélange," it alliterates better.

KIAs in Vietnam and Korea. Behind the war memorial is a small rose garden with a birdbath. Nearby, straight and tall, stands a flagpole from which Old Glory proudly waves.

A large marble monument honoring the Choctaw Nation also stands on the front lawn. No other Indian tribe is represented by a monument on the courthouse lawn in Haskell County. Near the gazebo, a large marble monolith honoring all unmarked graves in Haskell County looks out majestically over Main Street.

Not last, and certainly not least, the courthouse lawn holds two sturdy marble benches dedicated to and inscribed respectively by the Class of 1954 and the Class of 1955. The names of members of the graduating class are inscribed in (mostly) alphabetical order on the tops of the benches. The court is unsure why no other class demonstrated the wherewithal or initiative to erect a monument to themselves, or why the County perhaps approves of no other high school graduating class.

One of the sidewalks contains a section of "personal message bricks." Each brick expresses a dedication to a loved one or sponsor such as "Earl & Effie Cantrell" or "Oklahoma Natural Gas Company." The personal message bricks could be considered individual "monuments." On the two northern corners of the lawn are two small (approximately 3' x 5') white billboard advertisements with red lettering. The sign on the northeast corner points the way to "First Assembly of God, Stigler." The sign on the northwest corner points the way to "Bread of Life Ministry of Jesus."

Of course, the courthouse lawn is also the site of the Ten Commandments Monument.[2] But more on that anon.

---

[2] Hereinafter "the Monument" or "the Stigler Monolith."

Like the architecture of the courthouse itself, the lawn monuments have no apparent central theme to the amateur eye. One could argue that they all have some tenuous connection to the history of Haskell County. Of course, the flagpole and displayed American flag are also a "monument." Such a monument has no real connection to Haskell County history, except for the fact that Haskell County, since its inception, has been part of the Union. Those Haskell County men honored by the war memorials certainly died for that Union. In any event, the only apparent County policy regarding the placement of monuments on the lawn that existed prior to this lawsuit was in the nature of unwritten folklore. That policy ostensibly stated: "It must be in good taste, nothing vulgar, and can't cause a riot."[3]

Sometime in the 1990s,[4] Plaintiff James Green asked the County Commission for permission to erect a rose arbor monument honoring all Stigler high school graduates. At the time he made this request, the lawn contained only a few monuments. He was denied permission by the presiding commission,[5] allegedly being told, "We do not want to clutter up the courthouse lawn." The subsequent addition of the monuments previously described might call into question whether that goal has been met. Still, reasonable minds could differ. One might think that the addition of a cannon would be inspiring. Others may think that perhaps a shrubbery would be nice. Luckily, such aesthetic issues are not properly the province of the federal judiciary, but instead rest with officials answerable to the electorate.

---

[3] During this litigation, the County adopted a detailed, legalistic policy to govern future monument erections. That policy, and its adoption, play no part in the outcome of this case.

[4] Plaintiff Green was inconsistent over the course of this litigation in remembering the exact year.

[5] The Commissioners who denied Green's request were different from the ones approving the erection of the Monument.

The lucky officials answerable to the Haskell County electorate are members of the Board of County Commissioners. The Board operates and controls county property. Consequently, the Board also has the heavy burden of deciding what decorative items or monuments, if any, are placed on the courthouse lawn. The Commissioners during the relevant time period in this case were Henry Few, Kenny Short, and Sam Cole. Mr. Cole unfortunately died after this lawsuit was filed and only seventeen days after his deposition was taken. There is no known connection.

Mike Bush is a lifelong citizen of Stigler and a part-time substitute minister for various churches in the area. One day while having lunch with a friend, he felt as if "the Lord laid a burden on [his] heart." This burden involved erecting a Ten Commandments Monument on the courthouse lawn. On September 27, 2004, Bush was on the Board's agenda for its 10:30 a.m. meeting to discuss the Monument. Bush told the Board about the Lord placing a burden on his heart to erect the Monument, and advised the Commissioners he would take care of all the expenses for the project. Bush apparently had no drawings or plans for the Monument.

The minutes of the meeting state: "The Board met with Mike Bush to discuss getting a monument with the Ten Commandments on it to put on the courthouse lawn. The Board agreed Mike could go ahead and have the monument made and Mike is taking care of all the expenses." Other than Bush, no one else at the meeting discussed religion with regard to the decision to allow the Monument's erection. The Board discussed the historical aspects of the project. Erecting the Monument was solely the idea of Bush and not of any of the Commissioners. Bush proceeded to raise the funds to create the Monument with the help of local religious leaders and church groups, all of the Christian faith.

The Monument was planted firmly in the courthouse lawn on November 5, 2004, but was covered with a tarp until the unveiling ceremony that occurred two days later. The ceremony was not sponsored by the Commissioners or the County. Indeed, it was not even their idea. While it was open to the public, the unveiling ceremony was organized by Bush. Invitations were by word of mouth because everyone knows each other.

Lasting about an hour, the dedication ceremony was highly informal, impromptu and mostly religious in nature. Approximately one to two hundred people may have been present that Sunday afternoon and about seventeen churches were represented. Cole and Few attended the ceremony, while Short did not. Bush remembers Cole and Few saying a few words; however, Few denies speaking at the ceremony and does not remember if Cole spoke. Cole denies speaking. Apparently, neither gentlemen appeared in his official capacity as County Commissioner. No record exists of any words spoken by Cole or Few.

The Monument itself is eight feet tall and three feet wide. A subdued grey color, the Monument is inscribed in black letters with the Ten Commandments on the side facing Highway 9 and the Mayflower Compact on the side facing the courthouse.[6] The Ten Commandments are phrased on the Monument as follows:

---

[6] Testimony by Commissioner Short established the sizes of most of the monuments and their relative distance from each other. The Monument is larger than some on the lawn and smaller than some others. The court did not believe the distance between the monuments to be particularly material. Nevertheless, a not-to-scale diagram showing the approximate location of the monuments on the lawn was helpful and was admitted as Defendants' Exhibit 27.

The Ten Commandments

| I | Thou shalt have no other gods before me. |
|------|------|
| II | Thou shalt not make unto thee any graven image. |
| III | Thou shalt not take the name of the Lord thy God in vain. |
| IV | Thou shalt remember the sabbath day and keep it holy. |
| V | Thou shalt honor thy father and mother. |
| VI | Thou shalt not kill. |
| VII | Thou shalt not commit adultry [sic]. |
| VIII | Thou shalt not steal. |
| IX | Thou shalt not bear false witness against thy neighbor. |
| X | Thou shalt not covet thy neighbor's house. |

Exodus 20

Erected by Citizens of Haskell County

This phrasing has been described by all parties to this litigation as the "King James Version" ("KJV") of the Ten Commandments. That description is not grossly inaccurate, but is something of a stretch. The actual KJV of the Commandments, Exodus 20:1-17, is considerably lengthier, more complex, detailed and poetic:

And God spake all these words, saying,

I am the Lord thy God, which have brought thee out of the land of Egypt, out of the house of bondage.

Thou shalt have no other gods before me.

Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth:

Thou shalt not bow down thyself to them, nor serve them: for I the Lord thy God am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate me;

And shewing mercy unto thousands of them that love me, and keep my commandments.

Thou shalt not take the name of the Lord thy God in vain; for the Lord will not hold him guiltless that taketh his name in vain.

Remember the sabbath day, to keep it holy.

Six days shalt thou labour, and do all thy work:

But the seventh day is the sabbath of the Lord thy God: in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates:

For in six days the Lord made heaven and earth, the sea, and all that in them is, and rested the seventh day: wherefore the Lord blessed the sabbath day, and hallowed it.

Honour thy father and thy mother: that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbour.

Thou shalt not covet thy neighbour's house, thou shalt not covet thy neighbour's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor any thing that is thy neighbour's.

Exodus 20:1-17 (KJV).[7]  The Monument's text could best be described as a butchered paraphrase

of the KJV.  The only real similarities between them are the numerical order of the Commandments

and the prodigious use of the idiom "shalt."

---

[7]  Neither party offered into evidence the actual text of the KJV of Exodus 20:1-17.  The court feels justified in and obligated to take judicial notice of it pursuant to Rule 201, Fed.R.Evid.  Also, a "restatement" of the Commandments appears at Deuteronomy 5:6-21.

The text of the Mayflower Compact on the Monument states:

The Mayflower Compact
November 11, 1620

In the name of God, Amen.

We whose names are underwritten, the loyal subjects of our dread sovereign Lord, King James, by the grace of God, of Great Britain, France and Ireland king, defender of the faith, ect. [sic], having undertaken, for the glory of God, and advancement of the Christian faith, and honor of our king and country, a voyage to plant the first colony in the Northern parts of Virginia, do by these presents solemnly and mutually in the presence of God, and one of another, covenant and combine ourselves together into a civil body politic, for our better ordering and preservation and furtherance of the ends aforesaid; and by virtue hereof to enact, constitute, and frame such just and equal laws, ordinances, acts, constitutions, and offices, from time to time, as shall be thought most meet and convenient for the general good of the colony, unto which we promise all due submission and obedience.

In witness whereof we have hereunder subscribed our names at Cape-Cod the 11 of November, in the year of the reign of our sovereign lord, King James, of England, France, and Ireland the eighteenth, and of Scotland the fifty-fourth. Anno Domine 1620.

The court is unsure if the misspelling of the abbreviation for "et cetera" was a scrivener's error of the original Pilgrims or Bush.[8]

The Board never approved, or even reviewed, Bush's design of the Monument or the version of the Commandments that appears on it. Indeed, like Justice Scalia and this court,[9] none of the

---

[8] The court does not intend to sound condescending. Typographical errors are certainly not an indication of lack of intelligence. The court is sure of this because the court is also sure that this Opinion and Order will contain typographical errors, which will undoubtedly be gleefully and justifiably mocked by grammarphiles in our midst.

[9] See McCreary County v. ACLU, 125 S.Ct. 2722, 2762, n. 12 (Scalia, J., dissenting) (2005).

Commissioners knew that different versions of the Ten Commandments might exist at the time they voted to approve the Monument.

Bush himself admits that the addition of the Mayflower Compact was an afterthought of his own, and he intended to add it to help in defending the Monument against legal challenge. The Board also never officially reviewed or approved the addition of the Mayflower Compact to the Monument. At some time during the five weeks before trial, Bush also added the following text to the Monument: "Erected by the Citizens of Haskell County." Again, the Board did not apparently approve or even know about the addition of this language to the Monument. Monument inscribing in Haskell County appears not only to be decriminalized, but wholly unregulated.

After the unveiling of the Monument, the Commissioners were asked by members of the media to pose for pictures beside it. One photograph is taken from a very low angle and depicts the Monument and the Commissioners themselves towering over the viewer. The Commissioners never asked to be photographed beside the Monument. They simply posed as directed by the photographers.

After the unveiling of the Monument, and the initial media coverage of it, nothing happened. The Monument was not the site of protests, religious services, or witch burnings. It was not mentioned in any minutes of meetings of the Board. From all appearances, the Monument received no more attention than any of the other marble edifices on the courthouse lawn. Basically, nothing happened.

Well, not nothing entirely. Plaintiff James Green became offended by the Monument. Green has lived in Stigler for the last ten years. He visits the Haskell County courthouse frequently for a variety of purposes. Green claims he cannot avoid the Monument when he is conducting his

business at the courthouse because of its formidable appearance and its prominent placement on the lawn. Green is offended by the Monument because he believes its text is presented as a mandate and is thus an endorsement by the government of religious matters. He objects to the text of the Ten Commandments etched into the Monument because he subscribes to the later teachings of Jesus. He objects to the Ten Commandments because of their "terroristic origins."[10] Green also believes that his opposition to the Monument has caused Commissioner Sam Cole to destroy or ignore Green's open records request, his request for hearing impairment assistance and his petition regarding the location of the new county jail.

Like Green, Sharon Nichols is a resident of Stigler. Like Green, she owns real property and pays taxes to Haskell County. Like Green, she is offended by the Monument on the courthouse lawn. Nichols is a member of the ACLU-Oklahoma chapter. She believes the Monument is exclusionary and discriminatory because it is an explicitly religious text from a particular religious group, and gives the impression that the county supports and endorses the message of the Monument. Nichols goes to the courthouse for various reasons. She finds the Monument to be very prominent and thus unavoidable. Revealingly, despite the fact both Nichols and Green both vociferously reiterated the formidable and unavoidable nature of the Monument, neither individual noticed at the time of trial that Bush had recently added language to the Monument stating that it was erected by the citizens of Haskell County.

Thus, other than those things, not much happened after the Monument was erected. Not much, except of course, for the Plaintiffs' filing of this suit on October 6, 2005. Predictably, more things happened then.

---

[10] The KJV states explicitly that God will visit the iniquities of the fathers upon the sons. (Exodus 20:5) Of course, no such language is actually included in the text of the Monument itself.

For example, Bush circulated a petition. The petition stated, "We the undersigned, do hereby agree with and affirm the following petition: We support the decision of the County Commissioners to allow the erection of the Ten Commandments in front of the Haskell County courthouse, and will continue to support them in the upcoming legal battle." The petition includes seventy-four pages, about sixty-nine of which include signatures of Haskell County residents. No religious invocations or idioms were contained in the petition. Likewise, the County Commissioners did not draft or circulate the petition. It was not their idea.

The Commissioners also did not have the idea to stage a Rally in support of the Monument after the filing of this lawsuit. The Rally was also Bush's idea. He organized it on his own and publicized it with flyers posted all over town, including one on the courthouse door. Part of the poster shows a picture with a young girl standing before an American flag with her hands folded in prayer. The photograph is captioned "One Nation Under God," a phrase from the Pledge of Allegiance. The flyer contains no other arguably religious invocations. No one knows what county official, if any, ever approved the posting of the flyer on the courthouse door. News of the Rally also was mostly spread by word-of-mouth because, after all, everyone knows each other. Bush organized the Rally in response to the lawsuit. He intended the Rally to encourage the county to stand by its decision to allow the Monument to be displayed.

Approximately three to four hundred people attended the Saturday afternoon Rally. Henry Few and Sam Cole both attended, although there is no indication they attended in their official capacity as County Commissioners. Henry Few apparently said a few words at the Rally. No recording exists of his statement, but he was reported to have said something like: "I am going to stand in front of it and they are going to have to have a bulldozer to roll over me to remove the

Monument." Several other people spoke at the Rally including Bush. Most of the speakers were local Christian ministers. Their words were both political and religious in nature. United States Senator Tom Coburn also attended and spoke a few words.

The Monument did not begat the Rally. This lawsuit begat the Rally.

**Canto B.        Here Is Set Forth A Discussion Of The Witnesses, The Evidence And Other Matters, Some Procedural In Nature**.

The story of the Monument's erection unfolded at trial, through the testimony of James Green, Mike Bush, Henry Few, Gail Brown, Kenny Short, William Bruce Prescott, and Sharon Nichols. The court admitted Plaintiffs' Exhibits Nos. 1, 2, 3, 7, 14, 24, 25, 28, 31, 35, 38-50, 53, 54, and 85[11] and Defendants' Exhibits Nos. 2-9, 11-17, 23 and 27. The court also received the deposition of deceased County Commissioner Sam Cole, much of whose testimony was objected to by the Defendants.[12]

The court also conducted a view of the courthouse lawn to better assess the Monument's milieu. The parties consented to the view being undertaken in the absence of counsel "so long as

---

[11] Plaintiffs' Exhibit No. 85 was admitted upon the court's granting Plaintiffs' Motion to Allow Evidentiary Record Reopened for Limited Purpose of Admission of Photograph Reflecting Present Appearance of Monument Based on Court's Announcement of View [Docket No. 95].

[12] The court has ruled on those objections in a separate order [Docket No. 98].

the court does not talk to anybody."[13]  The court did not talk to anybody.  In addition to the evidence adduced at trial, the court's findings are based in part upon its observations during the view.

In listening to the evidence, the court was faced with many witnesses who had an agenda. The Commissioners' apparent agenda was to please the electorate.  Mr. Green and Ms. Nichols' obvious agenda was to remove the Monument.  Mr. Prescott's agenda appeared to be furthering the goals of his organizations, Mainstream Baptist and People United for the Separation of Church and State.

People with agendas often become advocates rather than dispassionate witnesses. Consequently, their appearance while testifying was key to the court's determination of their ultimate credibility.  For this reason, Sam Cole's deposition testimony is problematic.  Deposition testimony is, of course, perfectly acceptable for use at trial.  Nevertheless, the inability of the court to perceive Cole's demeanor while testifying like other witnesses gives the court pause in placing too much reliance upon it.

---

[13]  This exchange occurred at an off-the-record telephone status conference on August 1, 2006.  No counsel expressed any concern about a view, except that the court not converse with anyone during it.  Counsel promised to draft a stipulation to that effect.  A Joint Stipulation was filed [Docket No. 96]; however, it is so filled with caveats and conditions as to make the court believe that at least one of the parties engaged in extensive second-guessing and suffered serious buyer's remorse after the telephone conference.  It would be humorous if it was not so divergent from what was actually stipulated to during the conference.  Nonetheless, the court is more than happy to comply with counsels' exacting albeit evolving requirements included in the Joint Stipulation: the initial view occurred on February 3, 2006 at approximately 2:00 p.m.  The circumstances of the view were as follows: the court drove its pickup truck forty-five minutes to Stigler, looked at the Monument, and returned to Muskogee.  The purpose was to look at the Monument.  The view lasted about ten minutes.  It was a fun road trip, but no recordings, either audio, video or digital, were made of the occasion.  The second view occurred August 9, 2006 at approximately 11:30 a.m.  The view lasted thirty minutes.  The purpose of traveling to Stigler on this occasion was to observe the totality of the courthouse lawn and check the Monument for additional scrivener's errors.  The court looked at all the monuments and observed foot and vehicle traffic flow around the courthouse.  No recordings were made of the view.

Even so, Cole's deposition testimony revealed that he was obviously not enamored of Plaintiff James Green. This lack of admiration seems to arise from Cole's perception that Green is merely a courthouse gadfly – an "aginner" who does not like anything. Cole's dislike of Green appears to have predated the erection of the Monument and seems to arise from the dispute over the location of the county jail. In any event, Plaintiff Green did not prove a sufficient connection between Cole's alleged negative behavior toward him and Green's opposition to the Monument.

Because of the witnesses' agendas, the court's observations of their demeanor was key to determining many of the facts. For example, it was readily apparent that the Commissioners personally approve of the message of the Ten Commandments and personally believe the text of the Commandments, whether the KJV or not, is sacred. Conversely, the court also readily perceived that the Commissioners view the Commandments and the Compact as historically significant. Both Few and Short articulated the view that the Monument reflects America's legal tradition and religious heritage by reminding the public of "what we came here for," i.e., to escape governmental religious persecution.

To be sure, Plaintiffs' counsel impeached Few and Short with their prior deposition testimony on occasion. These episodes typically involved details, however, whose importance a reasonable mind could question, such as whether Bush actually possessed drawings of the Monument at the Commissioners' meeting, and other "who said what when" issues. Additionally, Commissioner Few's answers were sometimes not responsive to the question. The court saw that Few was not being intentionally evasive, but rather was simply not listening to the question. After a few suggestions from the court for him to listen more carefully, this problem subsided. In short,

the court perceived Few and Short to be highly credible witnesses. Their down-to-earth demeanor betrayed no dissembling, artifice or deception.

James Green was a credible witness for the most part. While relatively calm, he was also occasionally evasive on cross examination. Green likewise was occasionally impeached by defense counsel with prior deposition testimony. These episodes of impeachment were a bit troubling, as they appeared to reveal that Green's core principles were somewhat flexible. For example, he was inconsistent in his testimony regarding whether he was more offended by the Monument itself or by the Commissioners' alleged statements about the Monument. Additionally, Green was inconsistent in his testimony about whether he objects to the Mayflower Compact. To his credit, he does admit to the historical significance of the Commandments and the Compact. He disputes, however, their specific historical significance to Haskell County.

In contrast to Mr. Green's calm demeanor, Ms. Nichols was not just an advocate witness, she was a vehement one. She seemed intent on ensuring that her self-righteous indignation was on full exhibition at trial. Consequently, the court is adequately convinced of the high level of offense Ms. Nichols experienced because of the Monument. The court is not convinced, however, of her pointed complaint about Commissioner Cole.

Nichols claimed that she called Cole to register her protest of the Monument "in the strongest possible terms." The court has undeniable faith that she did so. Commissioner Cole allegedly questioned Nichols' religious credentials, stating, "I do not speak to people who aren't Christians," and hung up on her. Unfortunately, Nichols' lack of dispassionate testimony negatively affects her credibility with regard to this allegation. The court is skeptical about the allegations for another reason as well.

Defendants objected to the introduction of this testimony from Nichols. Defendants correctly claim that nowhere in Plaintiffs' Complaint, Initial Disclosures, or Witness List did Plaintiffs give any inkling that Nichols would provide such inflammatory testimony. Additionally, Plaintiffs never supplemented their Disclosures or Witness List regarding this allegation. Most strangely, Plaintiffs' counsel *did not inquire about the allegation* during Cole's deposition on February 28, 2006. Cole's deposition was taken under special conditions because of his poor health. Cole subsequently died on March 17, 2006 and the discovery deadline occurred on March 20, 2006. Nichols' allegations against Cole were first revealed in her deposition on March 2, 2006. Because of Cole's death soon after his deposition, and because no one inquired regarding the allegations at Cole's deposition, Nichols' allegations regarding Cole were effectively unrebutted at trial.

The mere fact that they are unrebutted, however, does not necessarily make them believable. Of course, the court has not made any finding that Plaintiffs' counsel did anything per se improper in failing to reveal these allegations at a time earlier than Nichols' deposition.[14] That is why the court overruled Defendants' objections to Nichols' testimony and the evidence was admitted. In such circumstances, however, the court might be remiss if it did not give some weight to the litigation tactics delaying the ultimate revelation of the allegations in addition to the demeanor of the witness who delivers them. The court believes Nichols' allegations against Cole are likely apocryphal.

James Prescott, as leader of the Oklahoma Chapter of Americans United for Separation of Church and State, traveled to Stigler apparently to investigate the Rally for purposes of testifying

---

[14] The failure of Plaintiffs' counsel to timely supplement their Initial Disclosures and Witness List is somewhat troubling. Ironically, Plaintiffs' counsel were aghast at trial that Defendants had not informed them that Bush had (again) engaged in unauthorized inscribing on the Monument.

about it at trial.[15]   Considering his purpose, his testimony was highly ambiguous, especially regarding Few's comments at the Rally.  The only specific comment he remembers Few making is the "bulldozer" quip.  Otherwise, his description of what Few said is hardly concrete and he appeared quite cloudy about his recollection.  Consequently, the court feels hesitant in giving that testimony much weight.

Plaintiffs make much of Few's testimony that he "does not believe in the separation of church and state."  Nevertheless, he explained the statement in his own inimitable style.  Few simply believes the doctrine of separation has been unnecessarily changed by judicial decisions over the years to be far more restrictive than needed or intended.  Reasonable minds certainly differ as to the validity of that conclusion, but it is hardly outside the mainstream of contemporary legal, philosophical or political opinion.[16]

The court is somewhat surprised that Plaintiffs mostly avoided addressing the significance of the addition of the Mayflower Compact to the Monument.  Perhaps by such avoidance Plaintiffs were telling the court that the Mayflower Compact has no real factual significance.  If so, the court respectfully disagrees.

Green and Nichols conceded the historical nature of the Commandments and the Compact, but assert that those texts lack a specific connection to Haskell County.  From their testimony and their demeanor, the court perceived that their real objection is that these historically significant texts

---

[15] Plaintiffs also proffered Prescott as an expert witness.  The court excluded that testimony, however, because his report was such a surfeit of partisan advocacy that the scholarship contained in it was significantly undermined.  Therefore, the court found that his expert testimony would be unhelpful.

[16] Some historical support for Few's position is presented in P. Hamburger, Separation of Church and State (Harvard University Press, 2002).

are also religious in nature. Even if the Plaintiffs' stated objection regarding the lack of historical nexus to Haskell County is sincere, the Commissioners' belief in the texts' historical significance is sincere as well.

Although having an undeniably religious tone, the Compact focuses on the people combining themselves into a "civil body politic." Those same people promised "due submission and obedience" to laws enacted by that body. Thus, despite containing some religious wording, the Compact is obviously a legal and political document. Its placement at the courthouse, Haskell County's legal and political center, is hardly incongruous. In response to the Plaintiffs' query, "What's it got to do with Haskell County," both Few and Short indicated that they consider the historical evolution of America's laws and traditions highly relevant to Haskell County, at which courthouse those laws and traditions are today administered and interpreted.

Few, Short and Cole testified that they were aware that Bush's request to erect the Monument implicated his free speech rights. They were also aware that the County had previously allowed other private citizens to erect monuments on the lawn. The County also allows private groups to conduct recruiting, fund-raising and awareness activities on the lawn. Consequently, the court believes that one of the purposes of the Commissioners in approving Bush's request was to protect the public from potential liability should his request have been denied.

# CANTICA II.  CONCLUSIONS OF LAW

**Canto A.**       **Justice the founder of my fabric mov'd:**
**To rear me was the task of power divine,**
**Supremest wisdom, and primeval love.[17]**

The First Amendment states as follows:

> Congress shall make no law respecting an establishment of religion,
> or prohibiting the free exercise thereof; or abridging the freedom of
> speech, or of the press, or the right of the people peaceably to
> assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I.  Like Dante needed Virgil, a court needs a guide to understand how this

provision might impact a monolithic marble monument with engravings of the Commandments and

the Mayflower Compact.  Luckily, the Supreme Court simultaneously handed down two decisions

regarding Commandments displays within the past thirteen months.  One might think that two such

recent precedents addressing the same subject would drastically simplify a trial court's quest in

deciding whether the Monument at issue here withstands constitutional scrutiny.  One might be

wrong.

In deciding the two cases involving the Commandments, the Supreme Court produced over

one hundred thirty pages of text and a mere ten separate opinions.  In McCreary, a five justice

majority of the Supreme Court applied the persistent yet opaque Lemon test[18] to find the

Commandments display in violation of the Establishment Clause.  Conversely, in Van Orden v.

Perry, 125 S.Ct. 2854 (2005), a plurality of the Court ignored the Lemon test and found the

_____

[17]  Alighieri, Dante, The Divine Comedy: Inferno, Cantica 1 (Allen Mandelbaum trans., Everyman's Library, 1995) [hereinafter Dante, and cited by cantica (Inferno, Purgatorio, Paradiso)].

[18]  Lemon v. Kurtzman, 403 U.S. 602 (1971).  The three prongs of the test are: (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster "an excessive government entanglement with religion."  Id. at 612-613.

Commandments display constitutional, with Justice Breyers' tie-breaking use of "the exercise of legal judgment" test, which he assures us is not simply a judge's personal predilection. Subsequent to these decisions, an obviously frustrated Sixth Circuit court complained, "Thus, we remain in Establishment Clause Purgatory."[19]

With all due respect to the Sixth Circuit, the Purgatory description hardly seems appropriate from either a theologic or literary perspective. The Catholic Church defines Purgatory as a "purification, so as to achieve the holiness necessary to enter the joy of heaven."[20] Likewise, Dante describes Purgatory as a place where the dew of repentance washes off the stain of sin and girds the spirit with humility before the soul ascends to the ethereal realm of heaven.[21] Admittedly, such cleansing is entirely different from the punishment of the damned. Nevertheless, application of current Supreme Court jurisprudence on Commandments displays hardly feels purifying. Furthermore, nothing about being an unelected judge given license to second-guess the decisions of elected officials does much to engender humility. Consequently, Purgatory seems wide of the mark.

While only hyperbole would cause the court to analogize to Cocytus, the state of the Establishment Clause jurisprudence is hardly Paradise. Indeed, it may be more akin to Limbo. Dante envisioned Limbo as a place of sorrow without torment, illuminated by the light of reason and home to virtuous pagans unfit to enter the kingdom of heaven.[22] Yes, we are definitely in Limbo.

---

[19] American Civil Liberties Union of Kentucky v. Mercer County, 432 F.3d 624, 636 (6th Cir. 2005).

[20] Catechism of the Catholic Church, 1031.

[21] Dante, Purgatorio, Cantica II.

[22] Dante, Inferno, Cantica I.

Whatever the analogy, the Sixth Circuit's complaint recognized that nothing close to a bright line test exists to guide either elected officials or judges in determining whether a government has established religion by displaying the Commandments. Not that a bright line test is inconceivable. Some might speculate that one faction of the Supreme Court would outlaw even the frieze depicting Moses on the Supreme Court building, while perhaps the other faction might find that displaying the Commandments never violates the Establishment Clause absent citizens being involuntarily forced to genuflect before them. Thus, while bright line tests are easy, quick and fun (i.e., the Holy Grail of the law), Limbo continues to be perhaps not only unavoidable, but also preferable.

**Canto B.** **Through me you pass into the city of woe:**
**Through me you pass into eternal pain:**
**Through me among the people lost for aye.**[23]

Before entertaining any hope of entering Limbo, however, the court is obliged to inquire, like an ersatz St. Peter, into the Plaintiffs' legal worthiness to even begin the journey. The doctrine of standing asks whether litigants are entitled to have a federal court resolve their grievance. <u>Kowalski v. Tesmer</u>, 543 U.S. 125 (2004). Determining this question involves an analysis of "both Constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975). In order to have constitutional standing, a party invoking the court's authority "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." <u>Raines v. Byrd</u>, 521 U.S. 811, 818-19 (1997) (quotation omitted). To demonstrate an adequate personal injury, a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both

---

[23] <u>Id</u>.

real and immediate, not conjectural or hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983).

No physical injury is needed to confer standing. A plaintiff need not have a bout of nausea, or even a sleepless night. Additionally, standing is clearly conferred by non-economic religious values. Anderson v. Salt Lake City Corp., 475 F.2d 29, 31 (10th Cir. 1973).[24] The non-economic injury must be directly effected, however, by the laws and practices against which a plaintiff's complaints are directed. Thus, allegations of a plaintiff's personal contact with a state-sponsored image suffice to demonstrate this kind of direct injury. Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir. 1989).

A plaintiff may adequately show an injury-in-fact when he is forced to view a religious object that he wishes to avoid but is unable to avoid because of his right or duty to attend the government-owned place where the object is located. All a plaintiff need do is view the object and take offense. To say this is not exactly a rigorous standard would be the height of understatement. In any event, Plaintiff James Green obviously has met the standard. He disagrees theologically with the Monument, and is confronted with the Monument when compelled to go to the courthouse for business. In short, he is offended – that is apparently all it takes. Green has suffered Establishment Clause injury.

For ACLU-Oklahoma, however, it takes a bit more. An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interest it seeks to protect are germane to the organization's purpose; and (3)

---

[24] In Anderson, the Tenth Circuit upheld a courthouse display of the Fraternal Order of Eagles monument. The case has been deemed superceded by Van Orden and McCreary, although its statements on standing remain valid. See Society of Separatists v. Pleasant Grove City, 416 F.3d 1239, 1241 n.1 (10th Cir. 2005).

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. <u>Hunt v. Washington State Apple Advertising Commission</u>, 432 U.S. 333 (1977). Through its representative Sharon Nichols, ACLU-Oklahoma seems to have proven (1) and (3). Nevertheless, the record at trial reflects nary a mention of the interests that the ACLU seeks to protect or the ACLU's purpose.[25] A court cannot take judicial notice of such things. The purpose of the ACLU-Oklahoma is not generally known within this jurisdiction and cannot be accurately and readily determined. While Plaintiffs' Complaint did allege the organization's purpose, the Defendants' Answer denied the allegation. ACLU-Oklahoma representative, Sharon Nichols, never mentioned the organization's purpose in her testimony. No stipulation of the parties mentions the organization's purpose. Plaintiffs did not even argue the ACLU-Oklahoma's purpose in their Motion for Partial Summary Judgment. Therefore, because of a dearth of evidence supporting the second prong of the <u>Hunt</u> test, the ACLU-Oklahoma lacks standing.

Having found that Plaintiff James Green suffered an injury-in-fact, does not halt the further analysis of prudential considerations that may limit challenges courts are willing to hear. <u>Secretary of State of Maryland v. Joseph H. Munson Company, Inc.</u>, 467 U.S. 947, 955-56 (1984). The prudential limitation strives to assure that a claim is not an abstract, generalized grievance that the courts are neither well-equipped nor well-advised to adjudicate. For example, a litigant normally must assert an injury that is particular to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens." <u>Warth v. Seldin</u>, 422 U.S. at 499. The reason for this is two-fold: the limitation "frees the court not only from

---

[25] By contrast, for example, in <u>Am. Civil Liberties Union of Ohio, Inc. v. Taft</u>, 385 F.3d 641, 646 (6th Cir. 2004), the ACLU submitted an affidavit from its Executive Director explaining the organization's purpose.

unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." United States v. Raines, 362 U.S. 17, 22 (1960). It further assures the court that the issues before it will be concrete and sharply presented. Baker v. Carr, 369 U.S. 186, 204 (1962).

In short, is it prudent for this court to hear this claim at this time? The issues certainly seem concrete and sharply presented. Plaintiffs have proven that they are offended. Plaintiffs have wholly failed, however, to prove that they were in any way, whether tangibly or intangibly, even slightly coerced into religiosity by the Monument. They are obviously not intimidated. No evidence has been provided to show that Plaintiffs suffer from the Monument any more than someone may suffer from a cloudy day, a splinter, or a flat tire.

In light of those conclusions, prudence might dictate that this court not decide this claim at this time.[26] The court is anxious, however, not to graft a heightened injury-in-fact requirement onto the standing issue and call it prudence. While perhaps standing could be employed more strictly,[27] it has not been so employed in these types of cases in this circuit. Therefore, the court declines to find that Plaintiff James Green lacks standing under the prudential limitation.

**Canto C.** **Here Is Set Forth The Catechism of McCreary and Van Orden.**

Because Plaintiff James Green is worthy under the doctrine of standing to bring his claim, attention must be directed at last to the merits of the claim itself. Of course, determining the merits

---

[26] In another Establishment Clause case, Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485 (1982), the Court said that the "psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury sufficient to give standing under Article III.

[27] See generally, Bickel, Alexander M., The Least Dangerous Branch: The Supreme Court at the Bar of Politics (Yale University Press, 1986).

means making our way through the Limbo created by <u>McCreary</u> and <u>Van Orden</u>.  Because the court is obliged to perform a nuanced fact-specific inquiry, an exposition of the similarities and differences between the Monument and the Commandments displays in <u>McCreary</u> and <u>Van Orden</u> is necessary, and perhaps even useful.

In <u>McCreary</u>, the Commandments displays were located on government property – hanging <u>inside</u> the courthouse.  The text of the Commandments was at first a very abbreviated version of the KJV.  The idea to display the Commandments originated with county officials, who also ordered that the display be posted in a "high traffic area" <u>inside</u> the courthouse.  The display contained a non-religious message explaining the historical significance of the Commandments.  Also, it was part of a larger display containing non-religious totems, such as the Magna Carta and the lyrics of the Star Spangled Banner.  One of the two displays was dedicated at a ceremony presided over by the Judge/Executive and his pastor.  Both the Judge/Executive and the pastor made religious comments at the dedication.

Of course, the <u>McCreary</u> display did not originally include equal-sized replicas of other documents.  These were added only after the ACLU sued to remove the displays.  The counties passed a second resolution authorizing an expanded display, including the Commandments and other documents in smaller frames, all of which had religious overtones.  The resolution itself had a consistent religious theme and was also posted with the expanded display.  After the district court put a judicial kibosh on that display, the county retained new lawyers, appealed the court's ruling and set up a third display.  This one included the Commandments with a more expansive translation along with other equal-sized historical documents accompanying it.  The religious resolution passed

with the second display was never rescinded.  Justice Souter's opinion in <u>McCreary</u> emphasized the obvious: the evolution of the displays demonstrated the County's litigation machinations.

In <u>Van Orden</u>, the Commandments display was on government property – <u>outside</u> on the grounds of the Texas State Capitol.  It was a granite monolith, similar in size to the Stigler Monument, that included two Stars of David and the Greek symbol for Christ.  At the top of the monument was an emphasized line of text stating: "I AM the LORD thy God."  It contained an inscription stating: "Presented to the people and youth of Texas by the Fraternal Order of Eagles of Texas, 1961."  Thus, the idea for and funding of the Texas monument apparently did not originate with the government, but with a private group, who also chose its design and was responsible for its maintenance.  The monument in <u>Van Orden</u> was likewise a part of a larger display of seventeen monuments and twenty-one historical markers commemorating the people, ideals and events that have composed Texan identity.

The circumstances regarding the Monument bear distinct similarities to the scenario in <u>Van Orden</u>.  A private person donated the Monument.  The Monument stands <u>outdoors</u> and is part of a larger display of other monuments.  Unlike the Texas monument, the Stigler Monolith is devoid of other explicitly and solely religious symbols such as the Star of David or the Greek symbol for Christ.  The Stigler Monolith does not have the large enhanced text proclaiming "I AM the LORD thy God," but instead includes the indisputably historical text of the Mayflower Compact.

All these similarities and differences with the Texas monument in <u>Van Orden</u> would seem to point towards the conclusion that the Monument does not run afoul of the Establishment Clause.  Differences do exist, however, which might give a court pause.  The Texas monument had existed for over forty years without complaint or controversy.  Also, people with a sophisticatedly artsy

viewpoint might see the monument display in Texas as more cohesive, more integrated, more, well, artistic than the Stigler mélange. These differences are not fatal, however, to the continued existence of the Monument.

In providing the deciding vote in <u>Van Orden</u>, Justice Breyer took into consideration the placid longevity of the Texas monument. That monument had inspired no protests, rallies or legal challenges since 1961. No doubt the lack of hoopla regarding that monument was also a relevant consideration under <u>McCreary's</u> teaching that we consider the history and circumstances of the display's creation. Justice Breyer asserted that "a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this long-standing, pre-existing monument has not." <u>Van Orden</u>, 125 S.Ct. at 2871 (Breyer, J., concurring).

This assertion provokes some difficult questions. For example, are now only "old" displays of religious text constitutionally permissible, or do "new" displays start out with a constitutional strike against them? Also, exactly why would a newer display be more divisive than an older one? Is it, as Justice Breyer suggests, because of our supposedly increased religious diversity? Or, is it because our nation is actually less religiously tolerant than earlier in our history? And relatedly, could such intolerance exist because the courts have so broadened the scope of potentially unconstitutional religious activity that they have actually magnified the state's hostility to religion while simultaneously providing federal court remedies for the slightest of hurt feelings? One could reasonably ask whether anyone could have even envisioned a legal challenge to the Texas monument when it was first erected in 1961. This court does not feign to know the answers to these questions, or whether the questions themselves are valid. Nevertheless, one observation is now indisputable. No governmental action even touching upon religious subjects will fail to garner a

congregation of eager litigants rapid to oppose it. Perhaps this is not so much evidence of government establishing religion as it is evidence of jurisprudence provoking litigiousness.

Justice Breyer did not intend that newer religious displays are automatically suspect. Such a position would be unworkable, not to mention somewhat illogical. The history and development of a display must be considered, but is not necessarily dispositive of the constitutional question. Logically, the objective effects of an edifice should often predominate in the analysis over governmental pronouncements occurring during the history of its creation. Long after such pronouncements are past and forgotten, the edifice and its objective effects will remain. Thus, the events occurring during the short life span of the Stigler Monolith would not necessarily transubstantiate it into a government establishment of religion. Anyway, the governmental pronouncements surrounding it are modest at most, and not religious at all.

In describing the collection of monuments on the Haskell County courthouse lawn, this court has used the term "mélange" and steered clear of more pejorative descriptions such as mish-mash or hodgepodge. The lawn and its displays may not be particularly similar to the "highly integrated" display on the grounds of the Texas capitol. Still, they are not displeasing to the eye. The dangerous issue is how a judicial evaluation of the artistic or historical merits of a display may be accomplished without the court's personal predilections trumping the aesthetic evaluation already conducted by elected officials.

In McCreary, Justice Souter chided the defendants for including the Ten Commandments and the Magna Carta in its collection of "foundational" American documents while failing to include the text of the Fourteenth Amendment. Additionally, he observed that although the county courthouse contained other displays besides the Commandments, the Commandments display was not

sufficiently "integrated" to form a secular display.  Unfortunately, the <u>McCreary</u> opinion leaves us bereft of any inkling regarding the appropriate school of artistic, architectural or historical criticism that should be brought to bear on an analysis of the proper amount of "integration" in a display, or whether the texts are appropriately "historical" to the reviewing judge.  The rather scary prospect of a court determining such things is partly avoided, however, by the requirement that the stated governmental purpose be genuine, not a sham and not merely secondary to a religious objective.[28] While the exact amount of deference to be accorded the artistic and historical choices of elected officials in government displays has never been explicitly articulated, the "not a sham" test sounds suspiciously close to the rational basis test, but with slightly more teeth.[29]

With regard to this Monument, the court has already found that the Commissioners' desire to accommodate Bush's display for its historical value was genuine.  In light of that conclusion, this court is reluctant to gainsay the historical and artistic impressions created by the monuments collected over the years on the Haskell County courthouse lawn.  Suffice it to say that the Haskell County courthouse lawn is pure Americana.  True, there is no grand integral design of the various monuments and displays on the lawn.  They were dreamed up, developed and deposited over the years, each reflecting that generation's view of what is appropriately historical, artistic and pretty. Perhaps the next generation will add the cannon or a nice shrubbery.  In any event, this court does not fathom how artistic integration must be a bedrock constitutional requirement simply because a text of one of the displays contains religious sentiments.

---

[28] <u>McCreary</u>, 125 S.Ct. at 2725.

[29] <u>Id.</u> at 2736, n.13.

The only similarity of any real concern between the Stigler Monolith and the Commandments display in <u>McCreary</u> is perhaps the associated hoopla, but important differences exist. No outcry or even interest was apparently produced by the Haskell Commissioners' actual vote to approve Bush's idea for the Monument's erection or in response to Bush's fund-raising efforts. No one else even attended the September 27, 2004 meeting. While the dedication for the Monument was undoubtedly religiously oriented, it was privately organized and publicized. Moreover, while two Commissioners did attend the Stigler dedication, they did not preside over it, or give a religion-tinged speech like the Judge/Executive in <u>McCreary</u>. No evidence proves that the Commissioners attended the dedication in their official capacity.

No evidence reveals that the news media hoopla was anything more than, well, standard news media hoopla. The Commissioners did not organize it or promote it. They did not seek out interviews. They answered questions and passively posed for pictures where and when asked. News media hoopla, without evidence of some active <u>governmental</u> reinforcement, does nothing more than reflect a spasmodic pang that temporarily sells media content but that a reasonable observer has forgotten by the next news cycle. For Establishment Clause purposes, it means little in the context of the evidence presented here.

The lack of government instigation of the news media hoopla is similar to the petition drive hoopla. Mike Bush, a private citizen, organized and implemented the petition drive in support of the Monument. Importantly, the petition drive was prompted by the commencement of the present litigation, not the erection of the Monument. The same goes for the Rally.

Oh yes, the Rally. Plaintiffs place great reliance on the Rally. Yet again, the Rally was not organized, or promoted by county government. The Rally was quite religious in nature, but it was

quite political in nature as well. Mixing politics and religion may be akin to mixing water and phosphorus, yet it is rarely unconstitutional absent heavy government involvement. While a Commissioner attended, the court is not persuaded that a reasonable observer would believe he attended in his official capacity. He spoke a few defiant words, but those words were not religious.

After its erection, no rallies were held around the Monument before the commencement of this lawsuit. Indeed, after the dedication and initial spasm of media attention, the citizens of Haskell County apparently paid no more attention to the Monument than the Commissioners did during the design and erection process. In other words, none. All was placid and peaceful until Plaintiffs could no longer stand the level of their offense and filed a federal case. Undoubtedly, the Rally hoopla was not caused by the Monument, but rather by the lawsuit. It feels somewhat discordant for Plaintiffs to file a federal case, bask smugly in the resulting frenzy, and then claim that same frenzy is an effect of the government's establishment of religion.

With regard to the Monument's differences from the circumstances in McCreary, a number of other important ones exist. Significantly, the Monument is outside, not inside, the courthouse as in McCreary, or inside the classroom as in Stone v. Graham, 449 U.S. 39, 41-42 (1980). The Commandments display in classrooms was found unconstitutional in Stone not only because of the dangerous impressionability of school children, but also because those children were literally trapped inside in the presence of the display for hours at a time, day after day, week after week for the entire school year. Despite the somewhat hyperbolic claim of the Plaintiffs here that the Monument is unavoidable, their forced exposure to the Commandments in Stigler pales to figurative whiteout conditions in comparison to the school children in Stone. Quite simply, the Monument is not unavoidable to anyone wanting to conduct business at the courthouse, especially because it is

not inside the courthouse itself.  Furthermore, where it is situated cannot accurately be described as a particularly "high traffic area" for people coming to the courthouse to conduct business.

Of course, the most significant difference between the Monument and the <u>McCreary</u> county case is that neither the idea nor the efforts for raising the Monument originated with the Haskell County Commissioners.  Those same Commissioners did not pass any resolutions regarding the Monument laced with religious statements or themes.  Those same Commissioners did not order the Monument placed in a "high traffic area" of government property.  Indeed, other than approving Bush's concept, those same Commissioners seemed to exhibit little concern or even knowledge let alone exercise any control or even supervision over the wording, design, and construction of the Monument.  While Bush may have added the Compact and the "Erected by" language to the Monument as a litigating position similar to <u>McCreary</u>, the Commissioners here took no part in such tactical shenanigans.[30]  The Commissioners' ongoing supervision of the Monument's morphing marble face shouts "Laissez-faire."

---

[30]  Initially, during the trial examination of Mike Bush, the court believed that Plaintiffs' counsel established that the Commissioners not only approved the addition of the Compact to the Monument, but also knew that it was added for litigation purposes.  Despite the court's gentle remonstrations, Plaintiffs' counsel continued cumulative questioning on the subject.  As a result, the actual state of the Board's scienter of the knowledge of the addition of the Compact now seems irredeemably ambiguous.  Under these circumstances the court is not convinced that the Commissioners ever officially approved the addition of the Compact (no meeting minutes reflect they ever voted on it) or that they knew the Compact was added for litigation purposes.  The court is persuaded that the Commissioners somehow had knowledge of the Compact eventually being part of the Monument, but when and how they acquired this knowledge remains a mystery.  In all likelihood, they gained this knowledge the conventional way: everyone knows each other and word travels in Haskell County faster than the constant airspeed of a European swallow.

**Canto D.**     **Before me things create were none, save things**
**Eternal, and eternal I endure.**
**All hope abandon ye who enter here.**[31]

As obvious from reading the above analysis, navigating through Limbo by evaluating the present case in light of Van Orden and McCreary is indeed sorrow without torment. Like wandering in the wilderness for forty years, it really gets us little closer to the Promised Land. A trial court cannot simply decide that its case is more like Van Orden than McCreary and stop the pilgrimage. Instead, a court must also deal with the trinity of the Lemon test.

A majority of justices of the Supreme Court appear willing to exorcize the Lemon test, but they have not done so (yet). That test retains precedential value. As stated by this circuit subsequent to the decisions in Van Orden and McCreary:

> This Court will therefore continue to apply the Lemon test as modified by Justice O'Connor's endorsement test while remaining mindful that there is "no test related substitute for the exercise of legal judgment." Van Orden, 125 S.Ct. at 2867 (Breyer, J., concurring in the judgment).

O'Connor v. Washburn University, 416 F.3d 1216, 1224 (10th Cir. 2005). As a result, an analysis of the Monument under a modified Lemon test is required penance, an act of piety towards the law, and a mitzvah.

The "purpose prong" of the endorsement test asks whether the government's actual purpose is to endorse or disapprove of religion. Bauchman ex rel. Bauchman v. W. High Sch., 132 F.3d 542, 551 (10th Cir.1997). In applying the purpose prong, a court should examine the "traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act." McCreary, 125 S.Ct. at 2733. Therefore, this court must evaluate the history of the

---

[31] Dante, Inferno, Canto I.

Monument's display to decide if Haskell County's "ostensible and predominate purpose" in erecting it was to advance or endorse the Judaic or Christian religions. See id. at 2733.

As recognized by Van Orden, the Commandments are obviously religious, but "simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." Id. at 2856. And, of course, Bush's motivations for erecting the Monument were religious. Whatever burden was laid on Bush's heart is mostly irrelevant to the analysis. The purpose prong of the endorsement test focuses on the intent of the government actor in displaying a particular work, not on the intent of the creator of the work. Summum v. City of Ogden, 297 F.3d 995, 1010 (10th Cir. 2002).

Neither the agenda of the September 27, 2004 Commissioners' Meeting, nor the minutes of that meeting, nor the undisputed testimony at trial regarding the content of the meeting reveal any religious purpose on the part of the Commissioners. While Bush revealed his religious motivation, the Commissioners discussed the historical significance of the Commandments. Furthermore, the Monument cost the County nothing. After deciding on the location for the Monument, the Commissioners took no further official action regarding it. They basically dropped out of the picture. Obviously a self-starter, Bush ran with the project, making all final decisions about the text, content and the style of the Monument. To the Haskell County government, the Monument basically fell on the courthouse lawn like manna from heaven.

The court is aware that two Commissioners apparently attended the religiously-toned dedication of the Monument. No evidence exists in the record, however, that the Commissioners were ever introduced or referred to in their official capacities or what, if anything, they may have said. This is far different than the situation in McCreary where the Judge/Executive made a religious

speech.  Furthermore, the court is aware that Commissioner Few attended the Rally and spoke at it. The words Commissioner Few spoke at the Rally, while defiantly defensive of the Monument, were not religious in nature.  Plaintiffs also failed to prove that Commissioner Few was ever introduced in his official capacity.

Some officials are permitted the liberty of occasionally acting as mere private citizens. Perhaps the President and the governors of the fifty states would not qualify for this category, but certainly commissioners of a small, sparsely-populated, rural Oklahoma county seem to fit the bill. To be sure, a Commissioner could appear at some public forums, and despite any protestations to the contrary, be appearing as nothing else but in his official capacity.  For example, the Commissioners acted explicitly in their official capacities at the Monday, September 27, 2004 meeting to approve Bush's Monument project.  With their appearances at the Monument dedication and the Rally, the capacity in which the Commissioners appeared is not quite clear. This lack of clarity stems entirely from the lack of evidence presented by the Plaintiffs on the issue.

The court concludes that the Commissioners did not attend the Monument dedication or the Rally in their official capacities.  The facts of this case are nothing like those in Staley v. Harris County, where the district court concluded that a reasonable observer would believe that the county officials appeared in their official capacities particularly because they appeared at a rally "during business hours, referred to their County affiliations, and described the County's reaction to the lawsuit." 332 F.Supp.2d 1030, 1038 (S.D.Tex. 2004), aff'd, 2006 WL 2349223 (5th Cir. August 15, 2006).  While the September 27, 2004 meeting was held during business hours, both the dedication and the Rally were held on the weekend.  The dedication was on a Sunday, and the Rally was on a Saturday.  No believable evidence exists that the Commissioners were ever referred to in their

official capacities.  Furthermore, given the nature of the humble tight-knit community in this rural Oklahoma county described by witnesses at trial, the court is not convinced that a reasonable observer would have viewed these men as speaking or appearing for Haskell County government.

The Defendants spent much time at trial presenting evidence and arguing that the County did not endorse the messages of the other monuments on the lawn; ergo, the County did not endorse the Monument.  After all, did Haskell County intend to endorse the Stigler High School Senior Classes of 1954 and 1955 to the exclusion of all other classes?  Did it intend to endorse the Choctaw Nation to the exclusion of all other tribes?  The argument is both viscerally and logically appealing.  The amount of potential hurt feelings caused by those people not represented by "County-endorsed" monuments boggles the mind and would probably result in droves of citizens besieging the County demanding a monument representing them.  The consequence would be a truly cluttered courthouse lawn.  That is not what has happened.  Therefore, the court concludes that the purpose of the County in approving any of the monuments was acceding to the wishes of various citizens and not endorsing the sentiments on the monuments.

The court is also mindful that the Commissioners testified that one of their purposes in approving the Monument was fear that a refusal would be a violation of Bush's free speech rights.  No doubt the Commissioners view the Ten Commandments text as sacred and approve of the Commandments' mandates.  Nevertheless, no actions or words spoken in their official capacities indicate that their own personal judgments were the motivation for approving Bush's erection of the Monument.  Secret motives of government officials have been recognized as not particularly relevant for determining official purpose.[32]  What must be evaluated instead is the purpose as seen

---

[32] See e.g. McCreary at 2735.

by an objective observer.  Secret motives are hidden from an objective observer.  Thus, Plaintiffs have failed to sustain the required burden of proof in showing that Haskell County's purpose in erecting the Monument was the ostensible and predominate purpose of advancing religion.

The "effect" prong of the endorsement test asks whether a reasonable observer aware of the history and context of the forum would find the display had the effect of favoring or disfavoring a certain religion. Bauchman, 132 F.3d at 551-52. The Constitution does not require, however, that the purpose of every government-sanctioned activity be unrelated to religion. Id. at 554 ("Courts have long recognized the historical, social and cultural significance of religion in our lives and in the world, generally."). Instead, the question of whether the government has endorsed a particular religious display depends in large part on the display's particular physical setting. Lynch, 465 U.S. 668, 671, 681-82, 685 (1984) (holding that a creche in a holiday display did not violate the Establishment Clause because the display also contained secular objects).

The effect prong of the endorsement test, however, presumes a reasonable observer "aware of the history and context of the community and forum" in which the display appears. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 317 (2000) (quotation omitted); see McCreary, 125 S.Ct. at 2736. The awareness of this reasonable observer is not limited to "the information gleaned simply from viewing the challenged display." Wells v. City & County of Denver, 257 F.3d 1132, 1142-43 (10th Cir. 2001) (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment)).  The effect prong of the endorsement test, however, is a question of law that this court decides without reference to the reactions of individual viewers. Bauchman ex rel. Bauchman v. W. High Sch., 132 F.3d 542, 555

(10th Cir. 1997). Nevertheless, it is unclear just how omniscient a reasonable observer is deemed to be.

Plaintiffs argue that the Monument is overpowering in its girth and particularly situated in a prominent area of the lawn. These factors, they assert, would cause a reasonable observer to conclude that the effect of the Monument is government endorsement of its religious message. The Plaintiffs are incorrect. Quite simply, the Monument is not particularly large, and is not in a clearly high traffic area. It may face a busy street, but so do almost all the monuments on the lawn.[33] Furthermore, the Monument does not appear to be placed in an area that is the most frequented route taken to the courthouse by citizens going there to undertake business.

A reasonable observer would also see that the Monument is clearly passive in nature. In no way is it "in your face." For example, a monument containing only the Commandments made of white marble with bright red lettering might cause more concern. The Monument itself, however, is very sedate, with muted colors and tone.

A reasonable observer would be aware that the Commandments and the Compact are primarily and historically legal dictates, and would know that the lawn of a courthouse is particularly appropriate for historical codes to be displayed. Likewise, a reasonable observer would know that a courthouse lawn is often a community gathering place, a place where various events and sentiments are memorialized and that this courthouse lawn follows in that American tradition by hosting an array of monuments with diverse messages. While effete elitists may consider those messages to be a little maudlin or the monuments themselves a little kitschy, a reasonable observer

---

[33] Sharon Nichols testified that she could easily read the Commandments from Main Street. The court does not doubt her visual acuity, but confesses to being unable to match it. During the court's view, the title of the Monument was readable from Main Street, but the text of the Commandments was not.

would see an aesthetic flow. Perhaps not fully unified or integrated, the mélange does, however, clearly represent what Haskell County citizens consider the noteworthy events and sentiments of their county, their state and their nation.

A reasonable observer would see that the Monument is not the focus of the courthouse lawn. The mélange of monuments surrounding the one at issue here obviously detract from any religious message that may be conveyed by the Commandments. Just as the inclusion of Santa Claus and Frosty the Snowman detract from any religious message of the Baby Jesus and Mary in a government-sponsored Christmas display, so too do the other monuments on the Haskell County courthouse lawn perform the same function here. Plaintiffs have failed to prove by a preponderance of the evidence that the Monument has the impermissible effect of advancing or promoting religion.

**Canto E.        Here Is Accomplished The Separation Of The Wheat From The Chaff**.

In the Final Amended Pretrial Order [Docket No. 85] for this case, both parties stipulated that among the issues of law for the court to decide are: (1) "Whether the installation and maintenance of the Monument of [sic] the courthouse lawn creates an excessive entanglement of Government with religion" (the third prong of the Lemon trinity); and (2) "Whether the Monument violates the Oklahoma Constitution, Article II, Section 5." The court is obligated to make findings on all issues properly presented at a bench trial. "The court need only make a brief, definite, and pertinent findings and conclusions upon contested matters." 9A Wright & Miller §2579 at 541 (1995) (emphasis added). In this case, however, Plaintiffs have submitted no briefing or proposed

findings or conclusions regarding these issues.  The court therefore considers them abandoned.[34]
See Coston v. Petro, 398 F.Supp. 2d 878, 880-81 (S.D. Ohio 2005).

Unfortunately not abandoned at trial was the unexpected dispute over who actually owns the Monument – Bush or the County.  Defendants took the surprising position that Bush still owned the Monument and could remove it at any time.  Bush's alleged ownership is certainly consistent with his penchant for changing the Monument without County approval or oversight.  In any event, the question of the Monument's ownership was never presented as a factual or legal issue in the Amended Pretrial Order. Therefore, the court declines to address it and cannot see how the issue would affect the outcome in any event.

Because the Monument does not violate the Establishment Clause, the court need not reach the Commissioners' affirmative defense that Bush's free speech rights may have required them to allow him to erect the Monument.  The court will note, however, that the Commissioners' concern was not unfounded.

The Tenth Circuit, in Summum v. City of Ogden, 297 F.3d 995 (10th Cir. 2002) and Summum v. Callaghan, 130 F.3d 906 (10th Cir. 1997), held that by allowing private groups to erect monuments inscribed with the Ten Commandments, similar to the Stigler Monolith, the municipalities had created "nonpublic forums" or "limited public forums."  The court will not delve into the Circuit's extensive analysis of those terms, but recognizes that, "[a] limited public forum

---

[34] To the extent the court is required to address excessive entanglement, simply by virtue of the Lemon test being before the court, the court finds excessive entanglement is not present.  The court must "examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority."  Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1261 (10th Cir. 2005) (citation and internal quotation marks omitted).  This project was privately organized and pursued, with Haskell County merely providing a space for the Monument, as it previously had done for other private individuals and groups.

arises where 'the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum.'" City of Ogden, 297 F.3d at 1002 (quoting Callaghan, 130 F.3d at 916). "Regulations of speech in a nonpublic or limited public forum are subject to the more deferential reasonableness standard." Callaghan, 130 F.3d at 916. The government may restrict access to a nonpublic or limited public forum and those restrictions "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Id.

Under the principles of the Summum cases, because Haskell County has allowed some private citizens to erect various monuments, the Haskell County courthouse lawn could arguably be considered a nonpublic or limited public forum. Unskilled in divination or prophecy, the court is uncertain whether the County would have been able to successfully defend an action by Mike Bush for violation of his free speech right. Had Bush been denied and decided to bring an action against the County, he likely would have argued that historical significance is one of the main criteria upon which the Commissioners base their decisions to allow or not to allow monuments to be erected on the lawn. The court believes he could have established a rational basis for a belief that the Ten Commandments and the Compact have historical significance to Haskell County. Bush could also argue that his monolith complements the other monuments on the lawn and is therefore aesthetically pleasing, thus satisfying another of the County's criteria. As the court has already noted, decisions concerning aesthetics are better left to those voted into office by the electorate.

Nevertheless, the court does not reach the question of whether Bush had the absolute legal right to place his Monument on the lawn. Indeed, the facts of this case are distinct from those in the

Summum cases given that the Ten Commandments monuments described in those cases themselves arguably created the nonpublic or limited public forums. The court merely notes that the Commissioners' concerns regarding Bush's free speech rights were not unjustified, and could have rationally been one of their purposes in approving the Monument.

## CANTICA III.  CONCLUSION

By approving Bush's plan to erect the Monument, Haskell County did not overstep the constitutional line demarcating government neutrality towards religion. Plaintiffs' request for injunctive and other relief is DENIED. The Monument does not violate the Establishment Clause and may remain on the courthouse lawn, peacefully and passively resting among the other monuments under the stars.

Dated this 18th day of August, 2006.

Ronald A. White
United States District Judge
Eastern District of Oklahoma